| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **ORDER** |
| ) | |
| **FRED D. GODLEY, JR., as** ) | |
| **Administrator C.T.A. of the Estate of** ) | |
| **Fred O. Godley and individually,** ) | |
| **GREGORY GODLEY, as former** ) | |
| **Co-Executor of the Estate of Fred O.** ) | |
| **Godley and individually, LISA** ) | |
| **GODLEY GILSTRAP, as former Co-** ) | |
| **Executor of the Estate of Fred O.** ) | |
| **Godley and individually, KIMBERLY** ) | |
| **GODLEY, as former Co-Executor of** ) | |
| **the Estate of Fred O. Godley and** ) | |
| **individually, RODNEY GODLEY, as** ) | |
| **Trustee of the Fred O. Godley Revocable** ) | |
| **Trust and individually, MARTHA** ) | |
| **GODLEY, WILLIAM C. GODLEY,** ) | |
| **ROBERT GODLEY, DAVID GODLEY,** ) | |
| **CATHY GODLEY MATTHEWS, IVY** ) | |
| **GODLEY BRUCE, MARK GODLEY,** ) | |
| **and PETER GODLEY,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

    **THIS MATTER** comes before the Court on the following: (1) Defendant Fred D.

Godley, Jr.'s ("Godley, Jr.") Motion for Summary Judgment and Supporting Memoranda, (Doc.

Nos. 15, 15-1, 23); (2) Defendants Gregory Godley, Lisa Godley Gilstrap, Kimberly Godley,

Rodney Godley, Martha Godley, William C. Godley, Robert Godley, David Godley, Cathy

Godley Matthews, Ivy Godley Bruce, Mark Godley, and Peter Godley's (collectively, with

Godley, Jr., "Defendants") Motion for Summary Judgment, Supporting Memoranda, and

Exhibits, (Doc Nos. 14, 14-1 to 14-19, 22); (3) the United States' (the "Government") Response in Opposition to Defendants' Motions for Summary Judgment and Supporting Exhibits, (Doc. Nos. 20, 20-1 to 20-20, 21, 21-1 to 21-6); (4) the Government's Motion for Summary Judgment against Godley, Jr., Supporting Memoranda, and Exhibits, (Doc. Nos. 31, 31-1 to 31-4, 42); (5) Godley, Jr.'s Response in Opposition to the Government's Motion for Summary Judgment, (Doc. No. 36); (6) the Government's Motion for Summary Judgment against Cathy Godley Matthews, Gregory Godley, Kimberly Godley, Peter Godley, Mark Godley, William Godley, and Robert Godley, Supporting Memoranda, and Exhibits, (Doc. Nos. 32, 32-1 to 32-3, 43); (7) Defendants' Response in Opposition to the Government's Motion for Summary Judgment, (Doc. No. 38); (8) the Government's Motion for Summary Judgment against Rodney Godley and Martha Godley, Supporting Memoranda, and Exhibits, (Doc. Nos. 33, 33-1, 44); and (9) Defendants' Response in Opposition to the Government's Motion for Summary Judgment, (Doc. No. 37). The motions have been fully briefed, and the Court held a hearing on the motions on September 16, 2015. See (Doc. No. 46). The issues are ripe for adjudication.

## I.     BACKGROUND

This is a civil action commenced by the Government against the administrator, former executors, and beneficiaries of the Estate of Fred O. Godley (the "Estate") to reduce Federal estate tax assessments to judgment, to foreclose on liens against property distributed from the Estate, and to obtain judgment against Defendants, jointly and severally, for various other Federal claims.           Defendants have moved for summary judgment on the grounds that the statute of limitations and that notions of due process bar the Government's action.  (Doc Nos. 14, 15).  In contrast, the Government urges that the statute of limitations has not run and that this suit provides sufficient due process for Defendants; therefore, the Government has filed

cross-motions for summary judgment against Defendants. (Doc. Nos. 31-33). The record establishes, the parties agree, and/or the parties do not dispute the following.

Fred O. Godley ("Decedent") was married to Martha Godley. He and Martha had three sons: Godley, Jr., William Godley, and Robert Godley, all of whom are defendants in this case along with Martha Godley. The remaining defendants in this action are Decedent's grandchildren: Gregory Godley, Lisa Godley Gilstrap, Kimberly Godley, Rodney Godley, David Godley, Cathy Godley Matthews, Ivy Godley Bruce, Mark Godley, and Peter Godley.

Decedent passed away on May 11, 1990. (Doc. No. 1 ¶ 12: Complaint). On May 16, 1990, Decedent's Will was filed and his Estate was opened for probate administration with the North Carolina Superior Court, Mecklenburg County (the "Probate Court"). (Id. ¶13). The Will named three of Decedent's grandchildren, Kimberly Godley, Lisa Godley Gilstrap, and Gregory Godley, as the Co-Executors of the Estate (the "Co-Executors"). (Id.). Under the residual clause of the Will, Robert Godley and William Godley received the majority of Decedent's real estate, which passed outside of probate and was valued by the Government at $563,327. (Id. ¶¶15-16).

After receiving extensions, the Estate filed its Form 706 estate tax return on August 14, 1991, reporting a total gross estate of $2,424,526 and a federal estate tax liability of $270,737. (Id. ¶¶ 22, 24). The Estate did not make any payment on the taxes owed when it filed its return; instead, it elected to defer payment of a portion of the taxes under section 6166 of the Internal Revenue Code (the "Section 6166 Election" or the "Election").[1] (Id. ¶25). Because the Estate did not pay the taxes due when it filed its return, on September 16, 1991, the IRS assessed $270,737 of estate tax against the Estate and noted the Section 6166 Election. (Id. ¶ 26). The

---

[1] All section references are to the Internal Revenue Code, Title 26 U.S.C., unless otherwise indicated.

portion of taxes for which deferral was elected under section 6166 was primarily associated with property inherited exclusively by Godley, Jr., which consisted of his interests in two closely held businesses, Godley Development Company and Concrete Panel Systems. (Id. ¶¶ 28, 48; Doc. No. 3 ¶139: Joint Answer & Crossclaim).

On July 22, 1991, the Co-Executors filed suit in North Carolina Superior Court, Mecklenburg County, against the other heirs of the Estate seeking declaratory judgments regarding accounts receivable flowing to and from the various parties and entities of the Estate. (Complaint ¶20). On April 27, 1992, the Co-Executors and the other heirs entered into a settlement agreement on this suit (the "1992 Settlement Agreement"). (Id. ¶28-29). The 1992 Settlement Agreement acknowledged the existence of unpaid Federal estate taxes and the Section 6166 Election regarding those taxes, and it included an agreement by Godley, Jr. to pay any additional taxes that might be owed to the IRS or to indemnify the Estate if it was called upon to pay such taxes. (Id.). The agreement also contained promises by all the heirs to repay any amounts previously advanced from the Estate if such demand was made by the Estate's personal representative. (Id.).

Between February 7, 1992, and October 3, 1994, the Estate paid a total of $227,875 in taxes to the IRS,[2] (id. ¶¶27, 31, 32, 35), which left $42,862 of the original tax assessment remaining unpaid. After auditing the Estate's return, however, the IRS issued a notice of tax deficiency to the Co-Executors and to Godley, Jr. on August 2, 1994, explaining that the Estate owed an additional $696,554 in estate taxes. (Id. ¶34). This deficiency was due in large part to the IRS's asserted increase in the valuation of property inherited solely by Godley, Jr. See (Doc.

---

[2] Under the Co-Executors' administration, the Estate made the following payments: $70,000 on February 7, 1992; $114,200 on August 13, 1992; $1,195 on November 13, 1992; and $42,480 on October 3, 1994. (Complaint ¶¶27, 31, 32, 35).

No. 20-9 at 9-12). On October 31, 1994, the Co-Executors filed a petition in the United States Tax Court ("Tax Court") challenging the additional $696,554 of estate tax by disputing the valuation of the property that the IRS claimed created the deficiency. (Complaint ¶37).

In November 1994, the Estate made distributions to all of the beneficiaries except Godley, Jr. (Id. ¶38-39). Included were distributions totaling $221,488 to John White, William Godley, and Robert Godley, all of whom signed refunding agreements providing that they would refund the amount distributed upon demand by the Estate's representative in the event any taxes were payable out of that distributed property. (Id. ¶40).

On December 29, 1994, the Co-Executors filed a petition with the Probate Court resigning from their positions, and with approval from the Probate Court, Godley, Jr. took over as the Administrator of the Estate. (Id. ¶¶42-43). As the new Administrator, Godley, Jr. also took over the prosecution of the Tax Court litigation regarding the valuation of the Estate property. Before handing the Estate over to Godley, Jr., the resigning Co-Executors transferred $443,916 in Estate assets to Godley, Jr. in his fiduciary capacity as Administrator, and Godley, Jr. acknowledged receipt of those assets by signing a Receipt, Release, and Refunding Agreement, which released and indemnified the resigning Co-Executors. (Id. ¶¶44-45). Godley, Jr. also filed a Preliminary Inventory with the Probate Court on December 29, 1994, showing that the Estate had probate assets of $443,916. (Id. ¶43).

After transferring control of the Estate and the remaining assets to Godley, Jr. in December 1994, the resigned Co-Executors and all other beneficiaries had no further involvement in the administration of the Estate. (Doc. No. 14-1 at 4). On March 28, 1995, Godley, Jr. filed an Inventory with the Probate Court listing the same Estate assets with the same value of $443,916. (Complaint ¶46). However, on January 3, 1996, Godley, Jr. filed the

Estate's Annual Accounting with the Probate Court reporting that he had distributed all of the $443,916 in Estate assets to himself during the preceding year and that the Estate held zero assets. (Id. ¶¶47-48).

After six years in litigation, the Tax Court entered an opinion on August 4, 2000, ruling on the valuation of the Estate's property. (Doc. No. 20-11). Based upon that opinion, the IRS assessed an additional $247,714 of estate taxes, rather than the initial deficiency amount of $696,554, against the Estate on August 1, 2001. (Complaint ¶52). Additionally, the Estate still owed $42,862 of unpaid taxes from the original assessment, as well as interest on both figures from February 11, 1991.[3] (Id.). Therefore, the Estate's total tax bill, before accrued interest, came to $518,451. Godley, Jr. appealed the Tax Court's opinion to the Fourth Circuit Court of Appeals, but the Fourth Circuit affirmed the decision on April 15, 2002. Estate of Godley v. C.I.R., 286 F.3d 210 (4th Cir. 2002).

The IRS had not received any further tax payment since the resigned Co-Executors made the payment to the IRS on October 3, 1994. (Complaint ¶35). Consequently on October 15, 2001, the IRS sent a "Statement of Tax Due IRS" (the "2001 Notice") to Godley, Jr., the Administrator of the Estate, which indicated that the Estate owed a total amount of $619,794. (Doc. No. 20-14). This amount included section 6166 payments that were due from past years' installments as well as the then-currently due installment payment in the combined amount of $177,177, plus penalties and interest in the amount of $442,617. The one-page statement instructed Godley, Jr. to "[p]lease return a copy of this notice with your payment," and it stated that the "balance [was] due within 10 days from date of this notice." It did not include any

---

[3] February 11, 1991, which was nine months after Decedent's death, is the date on which the Estate's Federal estate tax return was due. 26 U.S.C. § 6075.

instructions or warnings regarding termination of the Section 6166 Election or acceleration of the total amount of taxes due.  (Id.).

The IRS did not receive any payments from the Estate in 2001 or 2002, so it sent a notice and demand to Godley, Jr. on September 18, 2002 (the "2002 Notice").  (Doc. No. 20-16).  This Notice stated: "The Section 6166, Installment Agreement is in default due to non-payment and the account is in danger of being accelerated, making the full account balance due immediately. In order to avoid this, we must receive the installment payment by September 30, 2002."  The 2002 Notice attached a "Delinquent Billing" statement and a blank "Certification of Unchanged Status."  The billing statement showed that the estate had a previous balance of $798,332 and that the total now due on the account was $41,565 for the "Late 2002 Installment-Previously Billed" along with interest and penalties.  The statement also indicated: "In order to avoid ACCELERATION OF THE ACCOUNT, please send the amount due by September 30, 2002 along with the completed Certificate of Unchanged Status."  (Id.).

After again receiving no payment from the Estate, the IRS sent a third communication to Godley, Jr. on October 15, 2003 (the "2003 Notice").  (Doc. No. 20-17).  This eleven-page communication notified the Estate that its claims had been disallowed and that its "account [was] being accelerated for payment due to your 6166 election default."  (Id. at 2).  This Notice indicated that the Estate owed a total amount of $834,452 due and payable by October 27, 2003, and it provided information regarding the IRS's appeals process.  (Id. at 2-6).  Again, Godley, Jr. failed to take any action following his receipt of this Notice.  See (Complaint ¶¶35, 58).

On February 9, 2009, Godley, Jr. filed the Estate's Final Annual report with the Probate Court reporting zero assets in the Estate, and he requested that the Estate be closed.  (Id. ¶56).

There is no evidence on record indicating that the IRS took any action between October

2003 and November 2012; therefore, it appears the IRS did nothing during that nine-year period to attempt to collect the delinquent taxes.  On November 26 and 27, 2012, more than twenty years after the decedent passed and the IRS sent its first assessment,  the IRS filed Notices of Federal Tax Liens against the Estate in the property records of four North Carolina Counties, one South Carolina County, and one Virginia County.  (Id. ¶59).  On May 28, 2013, the IRS sent Notices of Federal Taxes Due to all the defendants in this case regarding the Estate's outstanding taxes.  See, e.g., (Doc. No. 14-8, ¶9).  Then, on September 27, 2013, the Government filed this suit to collect the unpaid estate tax liability.  (Doc. No 1: Complaint).  At the time of filing, the total unpaid balance of the Estate's tax liability had grown from the original 1991 and 2001 tax assessments of $518,451 to $1,418,665 with interest and penalties included.  (Id. ¶60).  That figure had increased to $1,470,031 by January 31, 2015.  (Doc. No. 31 at 14).

On October 24 and 30, 2014, Defendants' filed their Motions for Summary Judgment, (Doc. Nos. 14, 15), asserting the affirmative defenses of statute of limitations and due process. The question presented by Defendants' Motions is when the statute of limitations started to run. Defendants argue that the limitations period began running after the Estate defaulted on its Section 6166 Election and the IRS made notice and demand for the taxes in 2001 and/or 2002. The Government argues that the limitations period did not begin running until the IRS gave a notice and demand affirmatively terminating the Section 6166 Election and accelerating the entire amount of taxes due, which it argues did not occur until the IRS sent the 2003 Notice.  The Government filed its Motions for Summary Judgment on April 30, 2015.  (Doc. Nos. 31, 32, 33).

## II.  STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law.  Id.  The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  This "burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.

Once this initial burden is met, the burden shifts to the nonmoving party, which "must set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 250.  The nonmoving party may not rely upon mere allegations or denials of allegations in the pleadings to defeat a motion for summary judgment, rather it must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party."  Id. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party.  Anderson, 477 U.S. at 255.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion.  Anderson, 477 U.S. at 248-49.  "If the evidence is merely colorable or is not

significantly probative," summary judgment is appropriate.  Id. at 249-50 (citations omitted).

## III. DISCUSSION

No party disputes any of the material facts of this case, and the Court concludes that there are no genuine disputes as to any material fact for trial.  This matter, therefore, is appropriately decided upon the motions for summary judgment.

Defendants contend that the statute of limitations bars this action, and therefore, they are entitled to summary judgment as a matter of law.  The parties do not dispute the applicability of the general ten-year statute of limitations found in section 6502(a) or the suspension of the statute of limitations under 6503(b) and (d).  Rather, the dispute revolves around when the suspension of the statute of limitations was lifted and the limitations period began to run.  Defendants assert that the limitations period was triggered, at the latest, by the 2002 Notice, and therefore, the period expired almost a year before the Government filed this suit in September 2013.  The Government counters that the ten-year period did not begin running until 2003 under section 6503(d), and additionally, the limitations period has not yet expired pursuant to the alternative tolling provision found in section 6503(b).[4]

A. Suspension of Statute of Limitations Under Section 6503(d)

Generally, section 6502(a) provides that the IRS has ten years within which to collect a tax after it is assessed or to file a suit for judgment on the tax.  However, section 6503 provides exceptions whereby the ten-year statute of limitations is suspended for a period of time.  When a Section 6166 Election is made, section 6503(d) provides that the "running of the period of limitation for collection of any tax imposed by chapter 11 shall be suspended for the period of

---

[4] Although neither side addresses it, the Court notes that the defense of laches does not apply to the Government in tax cases.  United States v. Summerlin, 310 U.S. 414, 416 (1940); United States v. Appelbaum, 47 F. Supp. 3d 370 (W.D.N.C. 2014).

any extension of time for payment granted under the provisions of section . . . 6166."

Section 6166 provides that, under certain circumstances, an estate may elect to pay deferred estate taxes over a fifteen-year period. See § 6166(a). Under a section 6166 plan, deferred taxes are paid in up to ten equal, annual installments, with the first installment being made no later than the fifth anniversary of the due date of the estate's Form 706. § 6166(a)(1). Accordingly, there is a five-year deferral of the first payment of qualifying tax; however, the estate must pay interest on the deferred tax for years one through four. Then beginning in year five, the estate pays tax and interest for the next ten years. Id. The purpose of section 6166 is to prevent the forced liquidation of closely held businesses because of substantial estate taxes that arise from a decedent's ownership of those businesses. Lake Shore Nat. Bank v. Coyle, 419 F.2d 958, 962 (7th Cir. 1969). Pursuant to section 6503(d), the statute of limitations is suspended for the period of time in which an estate's Section 6166 Election is in place.

In order to continue "enjoying"[5] the Section 6166 Election, each annual installment payment must be made by the due date set by the deferred schedule. See Treas. Reg. § 20.6166A-3(a). If an estate misses a payment, thereby defaulting on its section 6166 installment agreement, "the unpaid portion of the tax payable in installments shall be paid upon notice and demand from the [IRS]." § 6166(g)(3)(A).[6] An estate's default on its section 6166

---

[5] The Government insists that the Estate "enjoyed" the deferral of paying its taxes pursuant to the Section 6166 Election. The Court questions the Government's choice of words. It is difficult to identify any "enjoyment" gleaned from this unfortunate situation, involving as it does, a disputed tax valuation which took years to resolve in the taxpayer's favor; a Service that seemed to move at times at a glacial pace; all the while "enjoying" the assessment of additional interest and penalties; and finally the anxiety and uncertainty - caused by the Service's dilatory actions – experienced by the bulk of the beneficiaries who had moved on with their lives after the 1994 transfer of control of the Estate and its assets to the Administrator.

[6] Section 6166(g)(3)(B) contains a six-month grace period within which an estate can cure the default and avoid termination of the section 6166 plan. This grace period has the practical effect of causing the IRS to wait an additional six months before making its notice and demand to

plan alone is not sufficient to trigger the statute of limitations.  Id.; see also United States v. Askegard, 291 F. Supp. 2d 971, 979 (D. Minn. 2003).  Therefore, the suspension of the statute of limitations under section 6503(d) is lifted and the ten-year limitations period begins running when: (1) an estate fails to pay any principal or interest payment pursuant to its Section 6166 Election; and (2) notice and demand for taxes due is made by the IRS.  § 6166(g)(3)(A).  In this case, there is no dispute that the Estate failed to make payments pursuant to its Section 6166 Election.  The determination of when the statute of limitations began running, therefore, hinges on when the IRS made notice and demand.

Defendants argue that either or both the 2001 Notice and 2002 Notice constituted notice and demand by the IRS such that the ten-year limitations period began running as early as October 15, 2001, and no later than September 18, 2002.  Therefore, the limitation period expired no later than September 18, 2012, and the Government's action to collect the taxes, which was filed on September 27, 2013, was filed after the ten-year statute had run.

Section 6166(g)(3)(A) specifies that notice and demand must be made following a default of the agreement; however, it does not specify the form that such notice and demand must take. Defendants assert, and the Government does not dispute, that the general statute addressing notice and demand, section 6303(a), governs in this situation.  Section 6303(a) provides that the IRS shall "give notice to each person liable for the unpaid tax, stating the amount and demanding payment thereof."  Defendants cite Tilley v. United States, in support of their contention that the form of a section 6303(a) notice and demand "is irrelevant as long as it adequately inform[s] the taxpayer of his or her tax liability and request[s] payment."  270 F. Supp. 2d 731, 738-39

_____

terminate the Section 6166 Election.  Consequently, it appears in this case, the October 15, 2001 and September 18, 2002 letters from the IRS correspond to installment payments that were due six months earlier on February 11, 2001, and February 11, 2002.  See (Doc. No. 20 at 17 n.42).

(M.D.N.C. 2003), aff'd, 85 F. App'x 333 (4th Cir. 2004) (quoting Smith v. Malone, No. C88-340Z, 1988 WL 126524, at *2 (W.D. Wash. July 15, 1988), aff'd, 894 F.2d 410 (9th Cir. 1990)). The Third Circuit has also interpreted section 6303(a) as containing the same two elements and has described a 6303(a) notice as one that gives the taxpayer "one last opportunity to pay the taxes before the government invokes the full panoply of its administrative collection powers." United States v. Jersey Shore State Bank, 781 F.2d 974, 978 (3d Cir. 1986), aff'd, 479 U.S. 442 (1987). Because the 2001 Notice indicated an amount "due within 10 days from the date of this notice" and requested payment of that amount, Defendants argue that the 2001 Notice satisfied the requirements of a section 6303(a) notice and demand and triggered the statute of limitations.

Defendants argue alternatively that, if the 2001 Notice is deemed insufficient, the 2002 Notice constituted notice and demand by the IRS and started the limitations period. The 2002 Notice stated: "The Section 6166, Installment Agreement is in default due to non-payment and the account is in danger of being accelerated, making the full account balance due immediately. In order to avoid this, we must receive the installment payment by September 30, 2002." (Doc. No. 20-16). The letter included a "Delinquent Billing" statement indicating that the "Previous Balance on Account" was $798,332 and that the "Total Now Due on Account" was $41,565. Furthermore, the statement stated: "In order to avoid ACCELERATION OF THE ACCOUNT, please send the amount due by September 30, 2002 . . . ." (Id.). The "this" referred to, Defendants argue, is acceleration, and the mandatory "must" in the payment demand triggers it.

Defendants rely heavily on Estate of Adell v. Commissioner, 106 T.C.M. (CCH) 377 (T.C. 2013), to support their argument that the 2002 Notice triggered the statute of limitations. The estate in Adell received several bills from the IRS detailing the total balance then-due. After receiving no response from the estate, the IRS issued "a final notice and demand for estate tax

installment payment . . . showing the total balance due from the estate at that time," which consisted of interest and penalties for the late payment of estate tax installments. The notice in Adell did not demand the entire amount of taxes owed, and the total balance then due did not include any future installment payments. Id. at *15-16. The notice did include a payment due date, and it stated:

> Our records indicate that you have failed to pay the Internal Revenue Code (IRC) section 6166 installment now due. If you fail to pay the delinquent installment by the payment due date shown above, the IRS will terminate your IRC section 6166 election and the total amount of estate tax deferred under IRC section 6166 will be due.

Id. at *16. In Adell, the IRS took the position, and the Tax Court held, that this communication was a notice and demand sufficient to terminate the estate's Section 6166 Election as a matter of law. Id. at *16, 25-26. Defendants argue that, because the language of the 2002 Notice was similar in substance to the language deemed sufficient to constitute notice and demand in Adell, the 2002 Notice constituted the notice and demand that triggered the statute of limitations.

The Government does not dispute that both the 2001 and 2002 Notices were notices and demands; however, the Government contends that those two correspondences "did not constitute the kind of notice and demand necessary" to trigger the statute of limitations under section 6166. (Doc. No. 20 at 18). Citing section 6166(g)(3)(A) and United States v. Askegard, 291 F. Supp. 2d 971, 979 (D. Minn. 2003), for support, the Government argues that a notice and demand operates to lift the section 6503(d) suspension of the statute of limitations only if the notice and demand affirmatively terminates the Section 6166 Election, accelerates all future installments, and demands payment thereof. Therefore, the Government contends that the statute of limitations did not begin running until the IRS sent the 2003 Notice, which communicated that the Estate's account was being accelerated and demanded payment of all taxes.

Section 6166(g)(3)(A) provides that if any section 6166 payment is missed, "the unpaid

portion of the tax payable in installments shall be paid upon notice and demand." In other words, section 6166(g)(3)(A) allows the IRS to terminate the Section 6166 Election and accelerate the account if an estate defaults on its payments. As the Magistrate Judge interpreted in Askegard, section 6166(g)(3)(A) does not provide that an account is accelerated automatically upon an estate's failure to make a payment. 291 F. Supp. 2d at 979. The court in Askegard did not reach the question of what constitutes notice and demand under the statute, but held only that an affirmative notice and demand by the IRS is required to terminate the Section 6166 Election and trigger the statute of limitations. See id. The Government attempts to extend Askegard's finding to mean that only a notice and demand that affirmatively terminates the Election, accelerates all future installments, and demands immediate payment of all installments can be a notice and demand that triggers the statute of limitations. The Court disagrees.

As the Government points out, the requirement of notice and demand gives the IRS discretion to determine when to terminate a Section 6166 Election and thereby start the limitations period. This comports with the Congressional purpose behind the statute, which is to give the IRS flexibility to work with estates and to determine when to terminate an estate's Election. See id. at 979-80 (citing Lake Shore Nat. Bank, 419 F.2d at 962). In light of the clear language of the statute and its underlying purpose, this Court agrees with the limited holding in Askegard that default alone does not automatically trigger the statute of limitations; notice and demand is required. But the Court disagrees with the Government's implication that Askegard requires simultaneous notice, demand, termination, and acceleration to trigger the statute of limitation clock.

The notice and demand requirement serves to give taxpayers fair warning before the IRS terminates the Section 6166 Election and demands immediate payment of all taxes. See Jersey

Shore State Bank, 781 F.2d at 978.  It is the proverbial shot across the bow.  This accords with other courts' interpretations of section 6166 that a notice and demand must be sent to the taxpayer before the IRS can accelerate the payments.  See, e.g., Lake Shore Nat. Bank, 419 F.2d at 962 (". . . Congress intended notice and demand to be a precondition for acceleration."); United States v. Askegard, 357 F. Supp. 2d 1152, 1164 (D. Minn. 2005) ("The IRS was not authorized to accelerate the payments, until after the service of the notice and demand . . . .").  It also coincides with the Congressional intent to give the IRS flexibility to work with a taxpayer to achieve a mutually beneficial outcome.

The IRS cannot take action by levy or court proceeding to collect assessed taxes while those taxes are subject to an extension to pay; therefore, section 6503(d) suspends the running of the statute of limitations during the period of extension.  In other words, so long as the Section 6166 Election is in place, which constitutes an extension of time to pay the taxes, the IRS cannot attempt to collect those taxes, so the statute of limitations is tolled.  Section 6166(g)(3)(A) simply delineates the process by which a taxpayer's unpaid taxes may be accelerated, which necessarily cannot be done without terminating the Election.  More simply put, pursuant to 6166(g)(3)(A), if an estate fails to make payments, the IRS may terminate the Section 6166 Election by notice and demand.  Taken together, sections 6503(d) and 6166(g)(3)(A) provide that the limitations period within which the IRS may bring suit to collect delinquent taxes is tolled until an estate's Section 6166 Election is terminated.  Therefore, the Court finds that a notice and demand must communicate to an estate that its Section 6166 Election will be terminated in order to trigger the statute of limitations.

Consequently, the question becomes which IRS notice terminated the Estate's Section 6166 Election.  The holding in Askegard offers little help.  Askegard stands only for the

proposition that a single missed payment does not automatically terminate the Section 6166 Election, which neither side in this case argues to be true.

Adell, a Tax Court case, is more apposite. "While [the Tax Court's] decisions may not be binding precedents for courts dealing with similar problems, uniform administration [is] promoted by conforming to them where possible." Dobson v. Comm'r of Internal Revenue, 320 U.S. 489, 502 (1943). "Rulings by the Tax Court on matters of tax law are therefore persuasive authority, especially if consistently followed." Esgar Corp. v. C.I.R., 744 F.3d 648, 652 (10th Cir. 2014). The Tax Court's analysis and decision in Adell comports with this Court's interpretation of sections 6166 and 6503,[7] and therefore, this Court finds Adell to be persuasive.

The estate in Adell failed to make installment payments for three years, and the IRS issued what the Tax Court determined, and the IRS agreed, was a final notice and demand, which stated that if the estate failed "to pay the delinquent installment by the due date shown above, the IRS will terminate your IRC section 6166 election and the total amount of estate tax deferred . . . will be due." 106 T.C.M. (CCH) 377, at *16. The Tax Court interpreted section 6166(g)(3)(A) and applied its provisions to that final notice and demand, which contained substantially similar language to the 2002 Notice in this case. The Tax Court determined that, upon the notice and demand, "the extension of time for payment of the estate tax provided in section 6166 [was] terminated as a matter of law." Id. at *25-26.

As both parties agree, the 2001 Notice constituted a notice and demand under section 6303(a). However, the 2001 Notice merely indicated the amount the Estate owed at that time and requested payment of that amount. It did not purport to terminate nor threaten to terminate

---

[7] It comports as well with the IRS's position in Adell. See 106 T.C.M. (CCH) 377, at *16, 25-26. The IRS's inconsistent position in this litigation is an attempt to have it both ways.

the Section 6166 Election.  Whether it was sufficient to trigger the statute of limitations need not

be decided, however, because the Court finds that the 2002 Notice did.

The 2002 Notice's language mirrors the language in <u>Adell</u>.  It threatened to escalate

collection efforts by accelerating the Estate's account, and it indicated that the IRS would

terminate the Section 6166 Election and collect the entire tax due if the Estate failed to make the

required payment by September 30, 2002.  The billing statements included with the 2001 and

2002 Notices were similar in that they both listed the total amount then due on the account and

demanded payment of that amount.  The 2002 Notice, however, went further by stating: "The

Section 6166, Installment Agreement is in default due to non-payment and the account is in

danger of being accelerated, making the full account balance due immediately."  The 2002

Notice went on to proclaim that, "[i]n order to avoid [termination of the Section 6166 Election

and the consequential acceleration of the account], we must receive the installment payment by

September 30, 2002."  The billing statement also reiterated: "In order to avoid

ACCELERATION OF THE ACCOUNT, please send the amount due by September 30, 2002."

(Doc. No. 20-16).  By this Notice, the IRS clearly communicated that the only way to avoid

termination of the Section 6166 Election and acceleration of the account was for the Estate to

pay the then-due installment payment by September 30, 2002.  The 2002 Notice, therefore,

served as the IRS's final warning shot across the bow.  It was the final notice and demand, which

provided the Estate fair warning of the impending termination of its Election and satisfied the

"precondition" for acceleration.  The IRS, in its discretion, issued the 2002 Notice propounding

the ultimatum that the Estate make the payment by the deadline, or its Election would be

terminated.  After this notice and demand, it was clear that, if the Estate failed to pay the

demanded amount by the IRS's deadline, the Section 6166 Election would be terminated and the

account would be accelerated. As a result, when the Estate failed to make the required payment by September 30, 2002, its Section 6166 Election was terminated as a matter of law, the unpaid portion of the estate tax that had been payable in installments was due in full, and the ten-year statute of limitations began running. The Court finds that, pursuant to sections 6166(g)(3)(A) and 6503(d), the ten-year statute of limitations began running on September 30, 2012, and therefore, this suit, which was filed nearly one year after the limitations period expired, is time-barred.

To interpret the 2002 Notice any other way, as the Government urges, would be inconsistent with the statutes and the intent behind the statutes. The logical extension of the Government's argument is that, simply by failing to send a communication that clearly and concurrently notices, demands, terminates, and accelerates an estate's account, the IRS can unilaterally and periodically suspend the statute of limitations. This would allow the IRS to circumvent the limitations period and keep the door open for potential future litigation by regularly issuing notices that threaten to terminate the Election rather than filing a lawsuit. Hypothetically in this case, the Government's theory would allow the IRS to issue notices and demands annually through 2011, thereby extending the limitations period through 2021; more than thirty years after Decedent's death. Although Congress gave the IRS discretion to determine when to terminate an estate's Section 6166 Election, it is inconceivable that Congress intended to give the IRS the discretion to manipulate the statute of limitations in this way.[8] The absurdity of that potential outcome further illuminates the wrongfulness of the Government's

---

[8] Furthermore, if the IRS were allowed to prolong the suspension of the statute of limitations in this way, it would be able to run up the charges by continuing to accrue interest and penalties. This case illustrates that scenario as the Estate's original tax bill of $518,451 nearly tripled to $1,470,031 after over 20 years of interest and penalties accrued.

theory, and the Court rejects it.

Given the Court's determination that the 2002 Notice triggered the statute of limitations, the implications of the 2003 Notice are irrelevant, and therefore, the Court will not consider the relevance of the 2003 Notice to this case.

B.  Suspension of Statute of Limitations Under Section 6503(b)

The Government argues alternatively, and without case support, that the statute of limitations has not yet expired pursuant to the tolling provision found in section 6503(b). Section 6503(b) provides that the statute of limitations shall be suspended for the period that all or substantially all of a taxpayer's assets are in the control or custody of any court, and for six months thereafter.  § 6503(b); 26 C.F.R. § 301.6503(b)-1.  Similar to section 6503(d), the purpose underlying this tolling provision is to suspend the statute of limitations "where assets are in the control or custody of a court because during this time they are not subject to administrative collection procedures."  S. Rep. No. 89-1708, at 24 (1966), as reprinted in 1966 U.S.C.C.A.N. 3722, 3745.

The Government argues that the assets of the Estate (the taxpayer in this situation) were subject to the control of the Probate Court until February 2009, when Godley, Jr. filed the final report and officially closed the Estate.  The Government concedes that all of the Estate's "original assets" were distributed from the Estate by January 1996.  However, the Government contends that the Estate still held assets in the form of contractual rights, which remained under the Probate Court's control until Godley, Jr. closed the probate in 2009.  These three sets of contractual rights consisted of: (1) a right under the 1992 Settlement Agreement to demand full payment from Godley, Jr. for any additional taxes owed by the Estate as a result of the Tax Court litigation or the Section 6166 Election; (2) the rights to recover distributions under the refunding

agreements that were signed by John White, William Godley, Robert Godley, and Godley, Jr. when they took distributions from the Estate in 1994; and (3) the right under North Carolina law to recover the value of the real estate that had passed to William Godley and Robert Godley outside of the probate estate. The Government reasons that, because the Estate still owed unpaid taxes, these contractual rights still existed as assets of the Estate when it was closed with the Probate Court in 2009, and when added together, these rights constitute "all or substantially all" of the Estate's assets. Consequently, the Government argues that all or substantially all of the Estate's assets remained subject to the Probate Court's control, and therefore, the statute of limitations did not start running until the Estate was closed in February 2009.

On the other hand, Defendants note, section 6503(b) is a recognition by Congress that normal administrative collection procedures are not available to the IRS while assets are held within an estate that is under the control of a probate court. However, "[t]he presence of assets of the decedent, substantial in value in relation to the total value of the decedent's estate, not subject to the custody and control of the probate court precludes" the section 6503(b) suspension of the statute of limitations. United States v. Silverman, 621 F.2d 961, 967 (9th Cir. 1980). That presence of assets outside of the estate and not subject to the control of a court "may be attributable to their passage from the decedent by means other than his last will or [by] partial distributions" from the estate. Id.

The undisputed facts of this case show that the last distribution of the Estate's assets occurred, at the latest, on January 3, 1996, when Godley, Jr. reported to the Probate Court that he had distributed the assets to himself and zeroed out the account. Therefore, as of January 1996, no leviable or inheritable assets of any substantial value, which had been owned by Decedent at death, remained in the Estate. Consequently, the distributed assets of the Estate were not subject

to the control of any court, and they were available to the IRS's normal administrative collection procedures no later than January 3, 1996. The Court finds that the section 6503(b) suspension was lifted and the ten-year statute of limitations began running on January 3, 1996; therefore, this suit is time-barred.

C. Due Process

Finding that this action is time-barred due to the running of the statute of limitations, the Court finds it unnecessary to further address Defendants' affirmative defense of due process.

**IV.    CONCLUSION**

For the foregoing reasons, the Court finds that this action is barred by the statute of limitations. Accordingly, the Court **GRANTS** Defendants' Motions to Dismiss, (Doc. Nos. 14, 15), and **DISMISSES** the United States' Complaint, (Doc. No. 1), with prejudice. Having dismissed the Complaint, the Court **DISMISSES as moot** the United States' Motions for Summary Judgment on its Complaint. (Doc. Nos. 31, 32, 33).

At this point, only Defendants Gregory Godley, Lisa Godley Gilstrap, Kimberly Godley, Rodney Godley, Martha Godley, William C. Godley, Robert Godley, David Godley, Cathy Godley Matthews, Ivy Godley Bruce, Mark Godley, and Peter Godley's Crossclaims against Fred D. Godley, Jr. remain. Under the doctrine of supplemental jurisdiction, "federal courts generally have discretion to retain or dismiss state law claims when the federal basis for an action drops away." Shanaghan v. Cahill, 58 F.3d 106, 109 (4th Cir. 1995); see also 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (3) the district court has dismissed all claims over which it has original jurisdiction . . . ."). The district courts "enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished;"

however, a court should take into account general principles of judicial economy, convenience, and fairness to the litigants. Shanaghan, 58 F.3d at 110. Because this case is at the summary judgment stage, the Court finds no overriding interest of judicial economy or convenience, nor is there any apparent unfairness to the parties of dismissal without prejudice of the state law crossclaims. In exercise of its discretion under 28 U.S.C. § 1367, therefore, the Court will decline to continue to exercise supplemental jurisdiction over the defendants' crossclaims. Having dismissed all claims over which it had original jurisdiction, the Court **DISMISSES** without prejudice the defendants' Crossclaims against Fred D. Godley, Jr. See (Doc. No. 7).

**IT IS, THEREFORE, ORDERED** that:

1. Defendant Fred D. Godley, Jr.'s Motion for Summary Judgment, (Doc. No. 15), is **GRANTED**;

2. Defendants Gregory Godley, Lisa Godley Gilstrap, Kimberly Godley, Rodney Godley, Martha Godley, William C. Godley, Robert Godley, David Godley, Cathy Godley Matthews, Ivy Godley Bruce, Mark Godley, and Peter Godley's Motion for Summary Judgment, (Doc No. 14), is **GRANTED**;

3. The United States' Motion for Summary Judgment against Fred D. Godley, Jr., (Doc. No. 31), is **DISMISSED as moot**;

4. The United States' Motion for Summary Judgment against Cathy Godley Matthews, Gregory Godley, Kimberly Godley, Peter Godley, Mark Godley, William Godley, and Robert Godley, (Doc. No. 32), is **DISMISSED as moot**;

5. The United States' Motion for Summary Judgment against Rodney Godley and Martha Godley, (Doc. No. 33), is **DISMISSED as moot**;

6. The United States' Complaint against all Defendants, (Doc. No. 1), is **DISMISSED with prejudice**;

7. Defendants Gregory Godley, Lisa Godley Gilstrap, Kimberly Godley, Rodney Godley, Martha Godley, William C. Godley, Robert Godley, David Godley, Cathy Godley Matthews, Ivy Godley Bruce, Mark Godley, and Peter Godley's Crossclaims against Fred D. Godley, Jr., (Doc. No. 7), are **DISMISSED without prejudice**; and

8. The Clerk of Court is hereby directed to close this case.

Signed: September 29, 2015

Robert J. Conrad, Jr.
United States District Judge